# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: November 4, 2022

* * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| STACY GINN and JENNIFER GINN, | * | |
| *parents of R.G., a minor,* | * | PUBLISHED |
| | * | |
| Petitioners, | * | No. 16-1466V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Ruling Awarding Pain and Suffering |
| AND HUMAN SERVICES, | * | Damages; Health Insurance; Febrile |
| | * | Seizures; Epilepsy. |
| Respondent. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

<u>Ronald Craig Homer</u>, Conway Homer, P.C., Boston, MA, for Petitioners.
<u>Felicia Langel</u>, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING AWARDING DAMAGES[1]

On November 7, 2016, Stacy Ginn and Jennifer Ginn ("Petitioners"), as parents of R.G., a minor, filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012).[2]  Petitioners alleged that R.G. suffered from epilepsy as the result of diphtheria-tetanus-acellular-pertussis ("DTaP"), inactivated polio ("IPV"), haemophilus influenzae type b ("Hib"), measles-mumps-

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the Ruling will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012).  All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

rubella ("MMR"), and influenza ("flu") vaccines administered on November 15, 2013. Petition at 1 (ECF No. 1). On March 26, 2021, a Ruling on Entitlement issued, finding Petitioners entitled to compensation. Ruling on Entitlement dated Mar. 26, 2021 (ECF No. 113).

Since the Ruling on Entitlement issued, the parties have worked to resolve all relevant items of damages but reached an impasse on future medical costs as well as the appropriate amount for pain and suffering. Regarding future medical costs, the parties disagree about whether R.G. should receive compensation for health insurance premiums versus the actual cost for his projected future medical and health care needs.

After consideration of the evidence, and for the reasons described below, the undersigned finds that Petitioners are entitled to receive an award that includes the cost of health insurance until R.G. reaches the age of 22. In addition, Petitioners are awarded actual pain and suffering in the amount of $200,000.00 for R.G., and an award for future pain and suffering in the amount of $5,000.00 per year, reduced to net present value, until R.G. reaches the age of 22.

## I.      RELEVANT PROCEDURAL HISTORY

An entitlement hearing was held on September 15, 2020, and the Ruling on Entitlement issued on March 26, 2021. Since then, the case has been in the damages phase. Damages Order dated Mar. 26, 2021 (ECF No. 114). The parties obtained respective life care planners and worked to resolve all outstanding items of damages. On March 30, 2022, the parties filed a joint status report in which they summarized the items of damages the parties agreed to, as well as identified the disputed items. Joint Status Report, filed Mar. 30, 2022 ECF No. 149). Because the parties reached an impasse as to certain items of damages, they submitted those to the undersigned for resolution.

Petitioners filed their memorandum in support of damages on May 2, 2022. Petitioners' Memorandum in Support of Damages ("Pet. Mem."), filed May 2, 2022 (ECF No. 154). Respondent filed his damages brief on May 31, 2022. Respondent's Damages Brief ("Resp. Br."), filed May 31, 2022 (ECF No. 155). On August 31, 2022, Petitioners filed a supplement brief. Petitioners' Supplemental Damages Brief ("Pet. Supp. Br."), filed Aug. 31, 2022 (ECF No. 157). On October 19, 2022, Respondent filed a status report updating the Court on the parties' agreement as to Petitioners' unreimbursed expenses of $22,072.33.00. Resp. Status Report, filed Oct. 19, 2022 (ECF No. 159).

The disputed items of damages are now ripe for adjudication.

## II.     ISSUES IN DISPUTE

In their joint status report dated March 30, 2022, the parties identified the damages items in dispute, including pain and suffering and future medical needs. Joint Status Report, filed Mar. 30, 2022 at 2. An updated Life Care Plan was also filed, with the parties' consolidated recommendations for each item and identifying the items in dispute. Pet. Exhibit ("Ex.") 35. The two most significant disagreements are the amount of an appropriate award for past and

future pain and suffering and whether health insurance should be awarded to cover the costs of R.G.'s future medical and health care needs.

## III.    SUMMARY OF RELEVANT MEDICAL RECORDS[3]

The relevant facts are summarized in the parties' submissions and will not be repeated here in detail.[4]  A very brief chronology, however, is helpful for context.

R.G. was born on November 11, 2009 and was healthy prior to the vaccinations at issue. At his four-year-old well child visit on November 15, 2013, he received MMR, DTaP, IPV, Hib, and flu vaccinations.  Pet. Ex. 1 at 1; Pet. Ex. 5 at 367.  Later that night, R.G.'s parents heard a strange noise and found R.G. shaking, unresponsive, and not breathing.  Pet. Ex. 10 at 2.  His lips were blue.  Id.  They called 911, and when emergency medical services ("EMS") arrived, they noted that R.G. was nonresponsive except to painful stimuli.  Pet. Ex. 3 at 6.  R.G. was transported by ambulance to the hospital.  Pet. Ex. 10 at 2.  He was seen by a physician in the emergency department ("ED") who noted that R.G. likely had a febrile seizure.  Pet. Ex. 7 at 5.  The ED physician documented that R.G. had received vaccinations less than 24 hours before the seizure.  Id. at 4-5.

On January 23, 2014, R.G. had a second seizure.  Pet. Ex. 7 at 23.  With this seizure, R.G. had nausea and vomiting, jerking, and loss of consciousness.  Id.  He was taken to the ED, where the physician noted that he had a seizure two months before, thought to be related to fever and/or vaccinations.  Id. at 24.  R.G. was referred for an electroencephalogram ("EEG").  Id.

R.G. had the EEG on January 29, 2014.  Pet. Ex. 5 at 389.  The EEG was abnormal, showing an "independent foci of spike activity in the right parieto posterior temporal occipital and left occipital regions."  Id.  The findings "indicate[d] the presence of a focal potentially epileptogenic process in these regions."  Id. at 389-90.

R.G.'s third seizure occurred on February 24, 2014.  Pet. Ex. 10 at 5; Pet. Ex. 5 at 417. During this seizure, he experienced jerking and shaking, and his color was ashen.  Pet. Ex. 5 at 417.  Afterward, he was sleepy and tired.  Id.  Subsequently, on February 25, 2014, R.G. saw pediatric neurologist, Dr. Castro-Reyes, who noted that R.G.'s first seizure occurred in November with fever after receiving vaccinations.  Id. at 418.  Dr. Castro-Reyes diagnosed R.G. with "[e]pilepsy with an abnormal EEG that showed multifocal spikes."  Id. at 419.  She prescribed anti-seizure medication, Trileptal.  Id.

Although R.G. began taking Trileptal in February 2014, he continued to have seizures. His fourth seizure occurred on March 19, 2014.  Pet. Ex. 5 at 462.  On April 20, 2014, R.G. had a full body seizure, and his body stiffened into a fetal position.  Id. at 472.  He turned blue and had decreased breathing.  Id.  After the seizure, R.G. was disoriented and confused, had slurred speech, and he remained lethargic until the following day.  Id.

---

[3] For a more complete summary, see Ruling on Entitlement at 2-5.

[4] See Pet. Mem. at 3-26; Resp. Br. at 2-3.

His sixth seizure occurred approximately one month later, on May 8, 2014, while sleeping. Pet. Ex. 5 at 483. Prior to having that seizure, R.G. became very clingy and asked to be held. Id. R.G.'s father believed that his son knew that he was about to have a seizure because of his clingy behavior. Id.

R.G. went approximately two years without a seizure, but, on July 6, 2016, at age six, he had a seizure lasting about 30 seconds. Pet. Ex. 12 at 6. He was lethargic and sleepy afterward. Id. R.G. remained on anti-seizure medication and remained seizure-free for the next two years.

However, on August 10, 2018, at age 10, R.G. had another seizure. Pet. Ex. 19 at 2. He was found unresponsive and blue in the kitchen at the family's home. Id. On August 3, 2020, R.G. was seen by Dr. Tran, who recommended that R.G. remain on medication. Pet. Ex. 25 at 58. R.G. had a consult with Dr. Kuerbitz, who observed that since 2013, R.G. had experienced 11 seizures. Id. at 32. The seizures had been less frequent since he had started oxcarbazepine 300 mg twice daily. Id.

Since 2018, R.G. had not had a seizure, but on September 27, 2021, (sixth grade) he experienced an aura while at school. Pet. Ex. 28 at 1-2. The school nurse administered clonazepam. Id. Afterward, R.G. became tearful and emotional. Id.

R.G. requires a 504 plan[5] at school due to his illness. Pet. Ex. 30 at 1. He continues to see his neurologist every six months and remains on anti-seizure medication. See generally Pet. Ex. 5. His neurologist, Dr. Burris, opined that R.G. will require medication and neurological follow-up for his epilepsy until he reaches age 22. Pet. Ex. 22 at 2.

## IV.    LEGAL FRAMEWORK

Relevant here, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).

Additionally, compensation awarded under the Program to a Petitioner for a vaccine-related injury shall include the following:

Actual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses which—

---

[5] Section 504 of the Rehabilitation Act of 1973 requires schools receiving federal financial assistance to "provide to students with disabilities appropriate educational services designed to meet the individual needs of such students to the same extent as the needs of students without disabilities are met." Protecting Students with Disabilities, U.S. Dep't Educ., Off. for C.R., https://www2.ed.gov/about/offices/list/ocr/504faq.html#skipnav2 (last visited Oct. 26, 2022). This may be in the form of accommodations and/or other specialized services. Qualified students may be those who have a "physical or mental impairment that substantially limits one or more major life activities." Id.

> (i) result from the vaccine-related injury for which the [P]etitioner seeks
> compensation,
> (ii) have been or will be incurred by or on behalf of the person who
> suffered such injury, and
> (iii)(I) have been or will be for diagnosis and medical or other remedial
> care determined to be reasonably necessary, or
> (II) have been or will be for rehabilitation, developmental evaluation,
> special education, vocational training and placement, case management
> services, counseling, emotional or behavioral therapy, residential and
> custodial care and service expenses, special equipment, related travel
> expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

Importantly, a petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

Payment of these elements of compensation is limited by § 15(g) of the Vaccine Act, which provides that

> Payment of compensation . . . shall not be made for any item or service to the
> extent that payment has been made, or can reasonably be expected to be made,
> with respect to such item or service (1) under any State compensation program,
> under an insurance policy, or under any Federal or State health benefits program
> . . . , or (2) by an entity which provides health services on a prepaid basis.

§ 15(g).

When Congress created the Vaccine Program, it contemplated that compensation would be provided "quickly, easily, with certainty and generosity." H.R. Rep. No. 908, 99th Cong., 2d Sess. 3 (1986), reprinted 1986 U.S.C.C.A.N. 6287, 6344.

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (citing McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims.  Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Graves, 109 Fed. Cl. at 580.  Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  Id. at 589-90.  Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

## V.    DISCUSSION

In determining an award in this case, the undersigned does not rely on a single decision or case, but has reviewed all of the evidence, including the medical records, testimony, expert reports, the Life Care Plan, medical literature, and briefs submitted by the parties.  The compensation awarded is based on the particular facts and circumstances in this case, with due consideration given to the circumstances and damages awarded in other cases cited by the parties, and other relevant cases, as well as knowledge and experience adjudicating similar cases.

### A.    Unreimbursable Expenses

The foundational framework for the undersigned's ruling rests on (1) the Vaccine Act's language allowing compensation for unreimbursable vaccine-related expenses for medical and other remedial care[6] that are reasonably projected and reasonably necessary; (2) R.G.'s significant vaccine injury—epilepsy; and (3) the fact R.G. has no health insurance available through his parents' employment.

Dr. Burris, one of R.G.'s treating neurologists, opined "[i]t is more likely than not" that R.G. will require neurological follow-up, anti-convulsant medication, and EEG and MRI studies until he reaches the age of 22.  Pet. Ex. 22 at 2.  The most recent EEG, done in 2019, was abnormal, showing "epileptiform activity in the left occipital, left centrotemporal, right center,

---

[6] Relevant here, § 15(a)(1)(A) also provides for unreimbursable expenses for "counseling, emotional or behavioral therapy."

and right frontal regions" indicating "focal potentially epileptogenic processes." Id. Dr. Burris explained R.G. will require regular neurological visits and medication therapy, EEG testing every two to three years, and MRI testing every five years. Id. For two to three years during R.G.'s adolescent years, Dr. Burris recommends psychological support be provided to R.G. Id. at 3.

The parties do not dispute that R.G. will need health care for his epilepsy. The issue is whether the award should be for projected actual costs or health insurance to pay for health care. R.G. currently has no health insurance. R.G.'s father, Mr. Ginn, is the primary earner, and he is self-employed. Accordingly, there is currently no insurance in the household afforded by his parents' employment.

R.G. is 12 years old, about to turn 13, and he has a significant neurological condition. Petitioners' life care planner, Maureen Clancy, R.N., B.S.N., C.L.C.P., recommends that the cost of health insurance be awarded to pay for R.G.'s future medical and health care needs. In the Life Care Plan, Ms. Clancy states that "[d]ue to the unpredictable course that an epilepsy diagnosis can present, particularly with [an] 11 year old [],[7] it is most prudent to recommend health insurance through age 25."[8] Pet. Ex. 35 at 2.

Petitioners assert that health insurance coverage is "reasonably necessary" due to the unpredictable nature of epilepsy, especially during the ages of puberty and adolescence. Pet. Mem. at 29. They point out that R.G. is on medication, will require periodic diagnostic tests (EEG and MRIs), and that the cost of specialty care, when there is no health insurance, can be variable. Id. They believe that health insurance is "the most effective way to ensure that R.G.'s ongoing medical care relating to his epilepsy is covered." Id.

In support of their position, Petitioners cite an article by Gloss et al.,[9] which provides neurology practice guidelines related to tapering and discontinuing antiseizure medication in an epileptic patient. Pet. Mem., Tab A at 3. R.G.'s medical records show that his neurologists, in consultation with R.G.'s parents, have discussed discontinuing his anti-seizure medication, but at present, R.G. continues to take oxcarbazepine daily. See Pet. Ex. 35 at 5.

In Gloss et al., the authors explain that the "purpose of prescribing an antiseizure medication (ASM) is to render patients with epilepsy seizure-free, a task that is accomplished approximately two-thirds of the time. When seizure freedom is achieved, there is the inevitable question of if and when ASMs should be weaned." Pet. Mem., Tab A at 4. Further, "[e]pilepsy is not considered resolved until a patient is seizure-free for at least 10 years and off ASM for at

---

[7] At the time the Life Care Plan was prepared by Ms. Clancy, R.G. was 11 years old.

[8] Petitioners seek health care insurance until R.G. reaches the age of 26, when "he would reasonably be expected to have health insurance coverage . . . through his employer or otherwise." Pet. Mem. at 29 n.5.

[9] David Gloss et al., Antiseizure Medication Withdrawal in Seizure-Free Patients: Practice Advisory Update Summary, 97 Neurology 1072 (2021).

least the past 5 years." Id. The authors observe that there are many factors clinicians must consider when recommending medication withdrawal; the decision-making process is complex and there are associated risks. Id. at 8-9. Physicians are advised to counsel their patients of these risks, which include seizure recurrence, that seizures may become refractory to medication, status epilepticus,[10] or death. Id. at 9.

Respondent disagrees that R.G. should receive the cost of health insurance, and instead recommends an award for "projected actual costs." Resp. Br. at 4. Respondent's position is that actual costs are "significantly more cost effective," health insurance premiums should not be awarded where there is a lower cost alternative, and "projected actual costs will sufficiently deal with future contingencies." Id. at 4-10.

To illustrate the costs involved, Respondent provided a chart that compares the cost of actual projected medical care to that for health insurance. Resp. Br. at 5 tbl.1. According to Respondent, when paid through age 25, health insurance premiums would cost $109,334.16, whereas the actual cost of projected care would be $22,041.25, making the difference between the two options $87,292.91. Id. The difference between the two would be less if health insurance is paid only through age 21. Id. When paid through age 21, the cost of health insurance premiums would be $75,692.88, the actual cost of projected care would remain $22,041.25, and thus the difference between actual cost versus the cost of health insurance would be reduced to $53,651.63. Id.

Respondent's life care planner, Laura E. Fox, M.S.N., B.S.N., R.N., C.L.C.P., noted that R.G.'s most recent seizure was in 2018, that he is on anti-seizure medication, and that he receives routine neurology follow-ups.[11] Pet. Ex. 35 at 2. Ms. Fox also noted that R.G. is in a regular school classroom and has "a 504-seizure action plan." Id. Regarding insurance, Ms. Fox explained that R.G.'s parents "do not have insurance and out of pocket expenses are provided. Per Dr. Burris[,] [] neurology follow up is recommended through age 21." Id. While Ms. Fox states that actual, out-of-pocket costs have been provided, she does not offer any explanation for this approach, or opine that health insurance is not reasonable.

In support of his position that actual costs are appropriate, Respondent cites Huber v. Secretary of Health & Human Services, 22 Cl. Ct. 255 (1991). Resp. Br. at 6. In Huber, Judge Wiese held that "health insurance premiums [were] a permissible item of compensation where the insurance can help cover those medical risks for which compensation would otherwise be allowable under the Act and where the insurance is, in fact, a lower-cost alternative to the funding of those risks." Huber, 22 Cl. Ct. at 257. Judge Wiese concluded that "the allowance of

---

[10] Status epilepticus is "a prolonged series of seizures without return to full consciousness between them[,] . . . which is life-threatening." Status Epilepticus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=108327 (last visited Oct. 26, 2022).

[11] Of note, however, the medical records indicate that R.G. experienced an aura in 2021 which required the use of a secondary medication used to treat a seizure, clonazepam.

insurance costs meeting these requirements grants no more than the statute permits and therefore cannot be regarded as an impermissible enlargement of the Act." Id. While the case was remanded back to the special master to address several issues, Judge Wiese recognized that the cost of health insurance could be an appropriate way to address the funding of medical risks—a concept applicable to the case at hand. Id.

The other cases cited by Respondent on the issue of health insurance do not address the facts and circumstances presented here. The vaccinee in Moteles was an adult, and while she had a profound neurological injury, there was no evidence that she had a seizure disorder that required her to see a specialist for follow up care, diagnostic testing, or that medication cessation was contemplated. Moteles v. Sec'y of Health & Hum. Servs., No. 90-644V, 1992 WL 109068, at *8 (Cl. Ct. May 4, 1992). The central issue in her case was the significant cost of residential care. Id.

In De Fazio, the vaccinee was also an adult, and his seizure disorder had resolved by the time his case was adjudicated. De Fazio v. Sec'y of Health & Hum. Servs., No. 90-3174V, 1997 WL 383142 (Fed. Cl. Spec. Mstr. June 25, 1997), aff'd sub nom. DeFazio v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 462 (1998). The issue was whether his depressive disorder, anxiety, and ADHD were vaccine-related injuries, and the special master found that they were not. Id. at *14. Thus, the question about whether to award the costs of health insurance became moot. Id.

Lastly, in Heins, the vaccinee was a child who was covered by his mother's health insurance. Heins ex rel. Heins v. Sec'y of Health & Hum. Servs., No. 90-819V, 1992 WL 63272 (Cl. Ct. Mar. 10, 1992). The mother was a nurse at Yale New Haven Hospital and had health insurance through her employer. Id. at *8. In contrast, R.G. does not have health insurance through either of his parents' employers.

The relevant inquiry here is whether actual costs take into account future medical risks in a 12-year-old child who has epilepsy, takes anti-seizure medication, and whose most recent EEG was abnormal. While he has been seizure-free for several years on medication, R.G. did experience an aura as recently as 2021, which required secondary medication to be administered at school. Notably, the records show that R.G.'s neurologists have discussed medication withdrawal. Dr. Burris opined "[i]t more likely than not" that R.G. will need medical care through age 21. Pet. Ex. 22 at 2. Based on these facts, it is reasonable to assume that at some point in the next several years, if R.G. remains seizure-free, R.G.'s neurologist may recommend that R.G be taken off his anti-seizure medication. The medical literature filed by Petitioners identifies risks associated with medication cessation.[12]

Respondent suggests that the Vaccine Act does not permit compensation for "speculative treatment" or a petitioner's "future, unforeseeable needs." Resp. Br. at 8. But risks attendant to seizures themselves or to medication withdrawal are not speculative or unforeseeable. While they may be rare, the risks are known and identifiable, and neurologists are encouraged to warn

_____

[12] See Pet. Mem., Tab A.

parents of children with epilepsy of these potential adverse consequences. Health insurance is the most reasonable way to address these medical risks.

Moreover, there is no way to project the cost of medical care and treatment assuming an adverse consequence did occur. Even if there were a way to estimate such costs, Respondent's projected future costs do not include a line item to reflect care that would be required for any of the known risk factors or future contingencies that could occur given R.G.'s diagnosis of epilepsy.

One of Respondent's objections to awarding the cost of health insurance is that it would pay for "non-vaccine related care." Resp. Br. at 6-7. Health insurance limited to the specific diagnosis of epilepsy is not available. Thus, of the options available and recommended by the parties, actual cost or health insurance, health insurance is the most reasonable under the facts and circumstances of this case. As Judge Wiese wrote in Huber, "the compensability of the expense is to be evaluated in light of the injury it seeks to redress." Huber, 22 Cl. Ct. at 257.

Further, as noted in Petitioners' memorandum, the cost of health insurance has been awarded in cases where the vaccinee will lose Medicaid insurance coverage due to a Vaccine Act award. Pet. Mem. at 34-35 (citing La Veck v. Sec'y of Health & Hum. Servs., No. 14-340V, 2015 WL 9194841 (Fed. Cl. Spec. Mstr. Sept. 11, 2015); Clement v. Sec'y of Health & Hum. Servs., No. 16-324V, 2018 WL 1835346 (Fed. Cl. Spec. Mstr. Mar. 7, 2018); Schwartz v. Sec'y of Health & Hum. Servs., No. 18-1454V, 2021 WL 1092923 (Fed. Cl. Spec. Mstr. Feb. 17, 2021); Master v. Sec'y of Health & Hum. Servs., No. 19-0006V, 2021 WL 966870 (Fed. Cl. Spec. Mstr. Feb. 12, 2021)). In these situations, the health insurance likely paid for "non-vaccine related care" but was found to be reasonable.

It is within the discretion of the Special Master to determine that health insurance premiums are "reasonably necessary" for medical care. Based on the facts and circumstances present here, the undersigned agrees with Petitioner that it is reasonably necessary for R.G. to have health insurance due to his vaccine-related injury of epilepsy. The undersigned, however, disagrees that R.G. should be awarded the cost of health insurance until he reaches the age of 26. Dr. Burris opined that R.G. will require neurological care and treatment until the age of 22, not 26. There is no evidence that due to his epilepsy, R.G. will need ongoing medical care once he reaches the age of 22. The undersigned, therefore, finds that the costs of health insurance shall be awarded until R.G. reaches the age of 22.

**B.    Pain and Suffering**

Petitioners request $220,000.00 for actual (past) pain and suffering for ages four (the age when R.G. had his first seizure) to present, a span of approximately nine years. Pet. Mem. at 39-40. Petitioners also requests an award of $10,000.00 per year in future pain and suffering,

reduced to net present value.  Id. at 40.  The statutory cap of $250,000.00[13] would thus be reached in 2025.  Id.

Petitioners argue this award would compensate R.G. for emotional stress and dysregulation of his life.  Pet. Mem. at 38.  Since 2013, R.G. has suffered from 11 seizures.  Id. at 30 n.7.  Petitioners note R.G.'s fear of additional seizures and explain that his independence has been "limited by his seizure disorder" because he is "unable to bathe or swim alone."  Id.

Respondent recommends that R.G. be awarded $180,000.00 for past and future pain and suffering.  Resp. Br. at 1.  Respondent believes this is appropriate because "each of R.G.'s seizures lasted no more than five to ten minutes, and he has no developmental delays or cognitive issues as a result of his epilepsy."  Id. at 13.

As described above, the factors to be considered when determining an award for pain and suffering include awareness of the injury, severity of the injury, and duration of the suffering. Here, awareness of the injury is not in dispute.  Although R.G. was a young child when he had his first seizure, there is no dispute that he had the ability of a child his age to be aware of his seizure.  As the parties do not disagree that R.G. had the ability to understand his injury, the undersigned's analysis will focus principally on the severity and duration of his injury.

Regarding the severity and duration, R.G. has experienced seizures since the age of four, or, for most of his life.  Seizures are dramatic and terrifying events.  R.G.'s records describe the circumstances surrounding his seizures and illustrate the suffering he experienced before, during, and after them.  During his first seizure, at four years old, he experienced wheezing and shaking, his lips turned blue, and he became unresponsive.  During his second seizure, he experienced vomiting and jerking.  He experienced jerking and shaking during his third seizure, and afterwards, he was sleepy and tired.  An EEG showed abnormalities consistent with epilepsy, and anti-seizure medication was prescribed.  In 2014, R.G. had a full body seizure, his body stiffened into a fetal position, he turned blue, and had decreased breathing.  Afterwards, he was disoriented, confused, and had slurred speech.  He remained lethargic with no appetite until the following day.  Before his sixth seizure, R.G. became clingy, and asked to be held.  His father believed that his son knew he was about to have a seizure based on this behavior.

In August 2018, after being seizure-free for over a year, R.G., then age eight, had a seizure at home.  Again, he was described as turning blue.  He continued to require medication and received a 504 plan at school.  In September 2021, at age 11, he had an aura while at school. clonazepam was administered by the school nurse.  Afterwards, he was tearful.

R.G.'s seizures resulted in loss of control of his body, rendering him unconscious.  He has experienced a seizure and an aura while at school.  R.G. is unable to enjoy activities that other children his age are able to do independently, like bathing or swimming.  Dr. Burris has recommended psychological care during his adolescent years.  Although his seizures are under

---

[13] Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000."  § 15(a)(4).

control, he has required the use of daily medications since he was four years old.  R.G. will continue to require medical care and treatment for his epilepsy until he is 22 years old.

The parties have cited a number of cases to support their respective positions on an appropriate award for pain and suffering, but none of these cases are factually similar.  There are other cases involving children with seizure disorders, but generally, the injuries include encephalopathy or developmental delays.  The most analogous case is one where a 12-year-old had post-vaccination encephalitis and seizures.  Bowlds v. Sec'y of Health & Hum. Servs., No. 13-956V, 2017 WL 5378090 (Fed. Cl. Spec. Mstr. Sept. 22, 2017).  The child was awarded $195,000.00 for pain and suffering.  Id. at *2.  Respondent contends the child in Bowlds was seizure-free after a year.  Resp. Br. at 13.  While R.G. did not have encephalitis, he has experienced seizures for a much longer duration of time than the child in Bowlds.

In light of all of the facts and circumstances here, the undersigned finds an award of $200,000.00 to be reasonable and appropriate for past pain and suffering, and $5,000.00 per year until R.G. reaches the age of 22, to be reasonable for future pain and suffering.

## C.    Other Items of Disputed Damages

The undersigned's ruling with respect to health insurance renders moot several disputed items in the Life Care Plan pertaining to future medical care, antiepileptic drug blood level monitoring, diagnostic testing (EEG and MRI), medications, and counseling.  See Pet. Ex. 35 at 1-5, 7.

Regarding the over-the-counter medication ibuprofen, the undersigned finds that the cost of $4.79 per year, as recommended by Respondent is reasonable, as it is consistent with the evidence related to R.G.'s most recent episode.  See Pet. Ex. 35 at 6.  The undersigned also agrees with Respondent that the cost of Tylenol is not reasonable, as it was not prescribed for seizures, and not mentioned during the site visit.  Id.  Thus, the cost for Tylenol will not be awarded.

The undersigned finds that the costs of an Embrace 2 smart watch and the standard package monitoring service are reasonable and awards the costs of those items until R.G. reaches the age of 22.  This is consistent with Dr. Burris' opinion that R.G. will need medical care for his seizure disorder through age 21.  See Pet. Ex. 35 at 8.

Petitioners also seek the cost for a seizure animal to alert R.G. and his caregivers that he might be having a seizure.  The undersigned finds the cost for an Embrace 2 smart watch and associated monitoring service to be more reasonable as compared to the cost for an alert dog.  Moreover, during his recent aura, R.G. recognized that he could be having a seizure, and was able to seek medical care.  The need for a seizure animal is also not reasonably necessary given R.G.'s infrequent seizures.  See Pet. Ex. 35 at 7.

Lastly, the parties dispute mileage reimbursement for transportation to various health care visits.  Pet. Ex. 35 at 9.  Mileage costs to the pediatrician for routine care will not be compensated.  Mileage costs for the neurologist, and for EEGs and MRIs are to be compensated

through age 21.  Mileage for counseling will also be awarded, to reflect the number of counseling visits recommended by Petitioners' life care planner, since she allows for more frequent visits during adolescence, consistent with Dr. Burris' opinion.  Id.  Thus, the undersigned finds these costs reasonably necessary.

## VI.    CONCLUSION

The undersigned awards Petitioners the cost of health insurance until R.G. reaches the age of 22, as well as the specific items addressed above.  Further, the Petitioners shall be awarded $200,000.00 in compensation for R.G.'s actual (past) pain and suffering for ages four to present, and $5,000.00 per year until R.G. reaches the age of 22, reduced to net present value.

If the parties are unable to agree on the amount of the net present value of the future pain and suffering award, the undersigned will use a one percent net discount.  See Dillenbeck v. Sec'y of Health & Hum. Servs., No. 17-428V, 2019 WL 4072069, at *15 (Fed. Cl. July 29, 2019), aff'd in part and remanded, 147 Fed. Cl. 131 (2020).

**The parties are to file a joint status report by Monday, December 5, 2022, (1) converting the undersigned's award of future pain and suffering to its net present value, (2) providing an updated LCP reflecting all items of damages agreed to as well as those awarded consistent with this Ruling, and (3) a list of all other items of damages agreed to by the parties.  Thereafter, a damages decision will issue.**

**IT IS SO ORDERED.**

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Special Master